UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 11-10002-FDS |
| ) | |
| CHRISTOPHER JAMISON ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government is asking the Court to accept the plea agreement negotiated by the parties and already tendered to the Court pursuant to Rule 11(c)(1)(C). That agreement calls for a sentence of 120 months and 5 years of supervised release with both parties reserving the right to propose (or object to) any Special Conditions. The plea agreement also allows the Court to impose any additional conditions of Supervised Release it believes appropriate without rejecting the underlying agreement. See Plea Agreement at ¶5(c).

1.  **The Court Should Accept the Plea Agreement Because the Agreed-upon Disposition Is Reasonable and Appropriate In View of All the Surrounding Circumstances**

The government believes that the agreed-upon disposition is an appropriate one that reflects the seriousness of the offense of conviction when considered in the context of the two guns also seized from the defendant's 46 Regent Street (one of which was alleged to have contained the defendant's prints while the other is alleged to have been linked to a shooting earlier that day on Centre Street in Jamaica Plain) as well as the defendant's

criminal record and his established affiliation with the H-Bloc Gang.  See PSR at ¶85 ("The defendant is a member of the H-Bloc street gang").  It does not and should not include the issue of whether Christopher Jamison killed Anthony Perry, which should only be determined in Suffolk Superior Court if and at such time as murder charges against him are re-instituted. The defendant is surely correct when he states that he has not yet had the opportunity to refute the murder charges dismissed in state court and should have the opportunity to do so in that forum without being penalized for that charge here.  PSR at page 36 Def. Objection #1.

The proposed plea (which permitted the defendant to plead to a drug charge in lieu of a firearms offense that could have subjected him to a 15-year mandatory minimum sentence under 18 U.S.C. §924(e)) calls for a sentence of 10 years, 20% under the low end of the applicable guideline range. PSR at ¶109.  That sentence does not seek to sentence Christopher Jamison based on anything other than the crime to which he pled guilty, other evidence of serious criminality (the two guns) found with the drugs, and what for him has been more than a decade of constant criminal conduct that in many instances has been linked to his admitted H-Bloc affiliation.[1]

---

[1] The plea agreement and agreed-upon disposition in this case also reflects an assessment by experienced counsel of the litigation risks posed by certain issues referenced in the

Jamison had two determinations of delinquency, both of which involved crimes of violence and resulted in Jamison being placed in DYS Custody until the age of 18.[1]  See PSR at ¶¶32-33.[2]  He picked up his first adult case about a month later and has been continually under some form of criminal justice supervision ever since (that is, for nearly eight years).  During that time, he has been convicted of crimes 8 times and served relatively short jail sentences in four cases, in large part due to his *six* probation violations between 2004 and 2008 in five separate

---

defendant's objections to the PSR and by certain pretrial motions which the Court (Gertner, J.) had begun to hear testimony on when the defendant agreed to the sentence contained in the plea agreement.  These are appropriate considerations under Rule 11(c)(1)(C). See United States v. BP Products North America Inc. 610 F.Supp.2d 655 (S.D. Tex. 2009)(in considering whether to accept a plea proffered under Rule 11(c)(1)(C), the court must take into account "the exigencies of plea bargaining from the government's point of view," including the "uncertainty of result")(citations and internal quotes omitted).  See also United States v. Bernard, 373 F.3d 339 (3rd Cir. 2004)(Rule 11(c)(1)(C) authorizes court to accept plea and impose sentence that otherwise falls outside sentencing guideline range).

[1] It is the government's view that the PSR incorrectly lists his second juvenile offense as simply an assault with  dangerous weapon when it was in fact an assault with a dangerous weapon (knife).  PSR at ¶33.  Because that issue is not material to any guideline or other issue in the sentencing of Christopher Jamison on the drug charges now at issue, the government did not object to it and does not do so now, noting however, its belief that the offense is not properly characterized in the PSR.

[2]  According to the PSR, Jamison spent six months in a secure facility before being released to the community by DYS.  PSR at ¶32.  Jamison was returned to DYS facilities on two occasions after breaching the conditions of his parole before being discharged from DYS custody on March 3, 2003, his 18th birthday. Id.

matters. See PSR at ¶¶34 (violations dated 1/27/04 and 9/20/04); 37 (violations dated 8/9/05 and 10/31/06); 38 (violations dated 11/21/05 and 1/18/08); 39 (concurrent violation); 41 (two concurrent violations).  While Jamison has not previously served a sentence of this magnitude, he has squandered every opportunity the criminal justice system has provided him to date and thereby demonstrated the appropriateness of the agreed-upon disposition here.  E.g., United States v. Tilley, 964 F.2d 66, 75 (1st Cir. 1992) (affirming sentence based on prior lenient treatment by state courts); United States v. Smith, 2007 WL 2947502, *7 (6th Cir. 2007) (imposing significant sentence where it was obvious that prior incarceration "was obviously not sufficient to comply with the purposes of § 3553(a)(2)").

Other factors also show that the agreed-upon sentence is appropriate in this case to protect society and protect Christopher Jamison from himself.  See Summary of BPD Reports attached as Exhibit 1.  Like the fact that the defendant has been shot three times (in 2005, 2006, and 2007), stabbed, and walks around with bullets lodged in his body.  PSR at ¶76.  See also Exhibit 1 at 20 (defendant stabbed on 5/15/04); 29 (defendant shot on 7/2/05); 40 (defendant and Jerome Marshall found taking victim of gunshot to hospital on 6/12/06); 47 (defendant found shot near Packy's Bar on 12/27/07 and is rushed to hospital in critical condition); 54 (gun linked to Centre

Street shooting found in 44 Regent Street address on 1/29/09). Or Jamison's admitted H-Bloc affiliation, itself one of the most significant markers for recidivism. See PSR at ¶85 (defendant admits to being a member of the H-Bloc gang). See also Huebner, et al., "Gangs, Guns, and Drugs: Recidivism Among Serious, Young Offenders" Criminology & Public Policy Volume 6 Issue 2 (2007)("Gang membership, even within a high-risk sample, emerged as a significant predictor of recidivism as more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not"); Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending"). See also United States v. Johnson 184 Fed. Appx. 746, 748 (10th Cir. 2006)(at sentencing, gang membership was "significant" and appropriate for inclusion in the PSR because. . . . "gang members are more likely to engage in criminal activity and perhaps related violence than ordinary citizens"); United States v. Aguirre-Roche, 305 Fed. Appx. 567 (11th Cir. 2008)(district court properly considered defendant's gang membership at sentencing). Considering all of these factors, the government believes that a sentence of 120 months is an appropriate one that fulfills all the considerations set forth in 18 U.S.C. §3553 and should be accepted by this Court.

## 2. While on Supervised Release, Jamison Should Be Subject To Associational and Geographic Restrictions That Keep Him Away from H-Bloc and His H-Bloc Associates

The government also believes that the defendant should be placed on Supervised Release for the 5-year period set forth in the plea agreement and should be subject to certain special conditions throughout that period. The first (and from the government's perspective) most important of these conditions is associational and geographic restrictions that will keep the defendant away from the areas where H-Bloc and its enemies on Heath Street operate and away from his H-Bloc Associates. See PSR at 75 (defendant's mother noted that she never had problems with defendant until age 14 or 15 when he started "hanging with the wrong people"). It is those people who are the subject of the proposed restrictions, attached as Exhibit 2.

While the government often advocates for such restrictions in cases from Boston that have gang implications, they are particularly important here because H-Bloc has been an active participant in one of the bloodiest gang disputes in the city in which young men from H-Bloc and young men from Jamaica plain's Bromley Heath Housing Development have been killing and wounding each other for years.[3] Hence, the need to keep the defendant

---

[3] See "Two Held without Bail in Jaewon Martin Slaying" (Boston Globe September 29, 2009) (detailing shooting of 14-year old on Heath Street basketball courts, allegedly by H-Block Members Timothy Hearns and Ramon Silvelo-Miles who were alleged to be on gang mission to shoot Heath Street members)(attached as

away from his prior associates and areas of gang disputes is critical.

The rationale for such restrictions couldn't be simpler:

> Recidivism is due to offenders' retaining criminogenic motivation or propensity and their having access to opportunities for crime. Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime. *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

Cullen et al, "Environmental Corrections–A New Paradigm for Effective Probation and Parole Supervision" 66 Federal Probation 28 (2002) (hereinafter referred to as "Cullen")(emphasis

---

Exhibit 3); "Prosecutor: Shooting Victim, 18, Mistaken for Gang Rival" (Boston Globe April 29, 2009)(discussing Commonwealth's case against Heath Street member Lamory Gray, alleged to have shot Belmont High School student Herman Taylor under the mistaken belief that Taylor was an H-Block member, in which prosecutor told a Suffolk County jury that, at of the time of the 2009 trial, there had been *50 shootings between members of H-Block and Heath Street)(*attached as Exhibit 4*)*; "Man Fatally Shot in Jamaica Plain Shopping District" (Boston Globe January 27, 2009) (discussing January 27, 2009 shooting of Heath Street member Anthony Perry and arraignment of H-Block member Christopher Jamison for January 27, 2009 shooting, which took place one year to the day of the discovery of the body of H-Block member Warren Hairston)(attached as Exhibit 5); "Gang Peacemaker's Death Imperil's Truce in Boston) (US8 Today March 6, 2007) (discussing death of H-Block member Jamohl Norfleet, murdered on November 28, 2006, one year to the date of the murder of Heath Street member Carl Searcy)(attached as Exhibit 6).  When the police executed the search warrant at 46 Regent Street on January 29, 2009, they found shirts memorializing H-Bloc members.  See Exhibit 7 (photos of Lipscomb and Norfleet shirts found in bedroom of 44 Regent Street on 1/29/09 ).  See also PSR at ¶77 (description of tattoos memorializing H-Bloc Founder Yorki Lipscomb and other deceased H-Bloc members).

supplied).  Because both the literature and commonsense show that opportunities for crime will be presented whenever a defendant returns to the area in which his offending began and grew (and in which his street credentials and sense of self may have been based on that very criminality), removing him from that area will reduce both the opportunities for further crime and the expectation from those around him that he will re-offend.  Thus, "[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . . reduce the extent to which offenders are tempted by and come into contact with opportunities for crime."  Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so when they are presented with opportunities to offend easily."); Dickey et al, Promoting Public Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety, Washington D.C.: Urban Institute Justice Policy Center, May 2004, at 61-62 ("when offenders first reenter communities, they themselves are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental health problems, lack of family connections, drug and alcohol addictions, lack of

education and employment. . . .Fixing' these problems is often implausible. . . .Instead, we can alter environments [and] remove temptations. . . ").

As commonsensical as these notions are, effective implementation is equally straightforward.  Rather than the rely on the sweeping provisions set forth in U.S.S.G. §5D1.3 (which are seldom invoked in revocation proceedings precisely because they are so broad),[4] the literature suggests that narrower restrictions are more effective--restrictions precluding the defendant from being with particular people or specific areas that the record shows have previously led him into crime. Cullen at 33 (recommending that probation officers attempt "to disrupt routine activities that increase crime opportunities" that are based on the defendant's past offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders) and "prohibiting traveling on specific streets" (e.g., areas of past criminality outlined on a map given to the offender). That is exactly what the government seeks to do here.[5]

---

[4] These "standard conditions" routinely incorporated into Judgments of Conviction include restrictions such as ordering that the defendant not to frequent "places where controlled substances are illegally sold, used or administered" that are so broad so as to be of little use in all but the most unusual case.

[5] In a presentation made to the Boston Bar Association last year, our own Probation Department has publicly stated that "associates and attitudes" are the two most important indicators or recidivism. While a defendant's attitude can be harder to change in the short term, (but can be helped by training like the

Of course, the government cannot advocate such restrictions without establishing their appropriateness. Appellate courts have routinely upheld such restrictions as a condition of probation or supervised release whenever, as here, the restriction served as a deterrent to protect the victimized community and/or rehabilitate the defendant. See <u>United States v. Garrasteguy</u>, 559 F.3d 34 (1st Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on defendant who sold drugs at Bromley Heath Housing Development); <u>United States v. Watson</u>, 582 F.3d 974 (9th Cir. 2009)(validating restriction that prevented defendant from entering city and county of San Francisco without the prior approval of his Probation Officer); <u>United States v. Cothran</u>, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia because his return to a high-crime neighborhood in southeast Atlanta would likely result in his continued criminal activity and the endangerment of neighborhood youth); <u>United States v. Sicher</u>, 239 F.3d 289, 292 (3d Cir. 2000) (upholding a supervised release restriction, after various drug convictions, that covered two counties in the

---

Moral Reconation Therapy Program offered by Probation and to which Mr. Jamison should be referred), access to criminal associates can be restricted by exactly the type of associational and geographic restrictions sought here and imposed in other cases involving members of these two gangs.

Allentown, Pennsylvania area because the "territorial limitation [was] clearly intended to promote [defendant's] rehabilitation by keeping [defendant] away from the influences that would most likely cause her to engage in further criminal activity"). See also United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of supervised release that required defendant to live in city several hundred miles away from family for first 12 months of supervised release; court noted that condition: (a) "will further [defendant's] rehabilitation efforts by temporarily removing him from the destructive influences that have plagued him;" and (b) "holds the potential to protect the community from future crimes as well").

    The requested restrictions should also be imposed here because the need for them is fully supported by the record.  The restrictions are based on Jamison's prior criminal contacts as shown on historic Boston Police Department Reports or from verified identifications of other H-Bloc members.  In fact, the historic Incident Reports attached as Exhibit 1 demonstrate that the proposed restrictions incorporate both the location of many offenses and many individuals that the defendant was with when they took place.   See Summary of BPD Reports at 9 (incident within proposed exclusion zone); 12 (same); 14 (same); 16 (same); 18 (same); 20 (incident with James McGhee and Robert Heckstall); 23 (defendant arrested within proposed exclusion zone), 25

(same); 27 (same); 29 (defendant shot at Kay's Oasis Nightclub at 1125 Blue Hill Ave with Richard Nichols, Justin Bly, and Damien Galloway all present); 31 (incident within proposed exclusion zone); 33 (incident within proposed exclusion zone with Curtis Porter and Michael Stallings Present); 35 (defendant in proposed exclusion zone in violation of probation terms); 37 (defendant stopped in exclusion zone in violation of probation terms with James Cassinette, Michael Stallings, and Nicholas Joseph present); 40 (incident in female shot twice in mouth within proposed exclusion zone with Jerome Marshall and Marquis Hunter present); 47 (defendant shot within proposed exclusion zone); 51 (incident within proposed exclusion zone with Shaba Olukoga present) 53 (defendant, Shaba Olukoga, Nicholas Joseph and Benzy Bain stopped within proposed exclusion zone after shooting of Anthony Perry on Centre Street in Jamaica Plain). Hence, the exclusion zone is the precise area in which the defendant is most likely to be presented with opportunities to re-offend and exactly where he should not be allowed to go.

In seeking these restrictions, the government is also sensitive to preserving established family relationships whenever possible. Here, his mother's current address is inside of the proposed exclusion zone. However, the government also notes that the defendant and his mother hope to live together outside the exclusion zone when he is released. PSR at ¶73. The fact that

the defendant and his family recognize the need for him to move away from H-Bloc's "territory" only accentuates the appropriateness of the proposed restrictions.

### 3. Other Recommended Conditions of Supervised Release

The government is also recommending the following additional conditions be imposed as part of the overall Judgement of conviction in this case:

**A. First Six Months of Supervised Release Should Be Served in a Halfway House Outside of Boston If the Defendant Is Unable to Obtain Suitable Housing.** The government recognizes that the geographic exclusion will keep the defendant away from some family contact and much that is familiar to him. To some extent, that is the point. In order to alleviate the disruption that this will cause and help the defendant re-integrate back into society upon his release, his first six months of supervised release should be spent in a halfway house outside of Boston *if* his mother has not relocated to a residence (or the defendant has not identified another suitable residence) outside the proposed exclusion zone that is acceptable to Probation.

**B. Mental Health Treatment.** The defendant should receive any appropriate mental health treatment while incarcerated and while on supervised release.

**C. Continued Education**. The defendant should be required to obtain his GED while on Supervised Release (if he has

13

not obtained it in Prison) and to attend any and all available job training while incarcerated and after release as direct by Probation.  <u>See</u> PSR at ¶94 (defendant hopes to obtain GED and start business; mother believes he should choose a trade).

**D.  Employment**.  The defendant should be required to seek and maintain employment while on Supervised Release.  <u>See</u> PSR at ¶95 ("the defendant's work history is limited").

**E.  Other Proposed Conditions.** The forgoing recommended conditions are in addition to others (such as drug testing), that the court would normally impose in a case of this nature.  The government also suggests that the court make a judicial recommendation that the defendant participate in Probation's RESTART and MRT Programs while on supervised release.

        Respectfully submitted,

        CARMEN M. ORTIZ
        UNITED STATES ATTORNEY

By: <u>/s John A. Wortmann, Jr.</u>
    JOHN A. WORTMANN, JR.
    Assistant U.S. Attorney
    One Courthouse Way
    Boston, MA 02210
    (617) 748-3207

**CERTIFICATE OF SERVICE**

    The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

                                            /S John A. Wortmann, Jr.   10/10/11
                                            JOHN A. WORTMANN, JR.
                                            Assistant U.S. Attorney